## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Civil A. No. _____ |
| *ex rel.* | : | |
| | : | JURY TRIAL DEMANDED |
| [UNDER SEAL] | : | |
| | : | |
| v. | : | FILED UNDER SEAL |
| | : | Pursuant to 31 U.S.C. § 3730(b)(2) |
| [UNDER SEAL] | : | |
| | : | **DO NOT POST ON PACER** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## COMPLAINT


**ROSS FELLER CASEY, LLP**
Brian J. McCormick, Jr., Esquire
Robert Ross, Esquire
Joel J. Feller, Esquire
Matthew A. Casey, Esquire
One Liberty Place
1650 Market St., Suite 3450
Philadelphia, PA 19103
Tel.: 215-574-2000

Claudine Homolash, Esquire
CQH Firm
One Liberty Place
1650 Market Street, 36th Floor
Philadelphia, PA 19103
Tel: 267-207-2730


*Attorneys for Plaintiff-Relator*

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| STATE OF ARKANSAS, | : | Civil Action No. _____ |
| STATE OF CALIFORNIA, | : | |
| STATE OF COLORADO, | : | **JURY TRIAL DEMANDED** |
| STATE OF CONNECTICUT, | : | |
| STATE OF DELAWARE, | : | **FILED UNDER SEAL** |
| STATE OF FLORIDA, | : | **PURSUANT TO 31 U.S.C. §** |
| STATE OF GEORGIA, | : | **3730(b)(2)** |
| STATE OF ILLINOIS, | : | |
| STATE OF INDIANA, | : | **DO NOT POST ON PACER** |
| STATE OF IOWA, | : | |
| STATE OF LOUISIANA, | : | |
| STATE OF MARYLAND, | : | |
| COMMONWEALTH OF MASSACHUSETTS, | : | |
| STATE OF MICHIGAN, | : | |
| STATE OF NEVADA, | : | |
| STATE OF NEW JERSEY, | : | |
| STATE OF NEW YORK, | : | |
| STATE OF NORTH CAROLINA, | : | |
| STATE OF OKLAHOMA, | : | |
| STATE OF RHODE ISLAND, | : | |
| STATE OF TENNESSEE, | : | |
| STATE OF TEXAS, | : | |
| COMMONWEALTH OF VIRGINIA, | : | |
| STATE OF WASHINGTON, | : | |
| STATE OF WISCONSIN, | : | |
| CITY OF NEW YORK, | : | |
| DISTRICT OF COLUMBIA, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| *ex rel*. JOHN DOE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| AQUA PHARMACEUTICALS, LLC, | : | |
| | : | |
| Defendant. | : | |

## COMPLAINT

On behalf of the United States of America (the "United States" or "Government"), and various state and local governments, pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA"), and analogous state laws and statutes, Relator John Doe makes this Complaint against Defendant Aqua Pharmaceuticals, LLC ("Aqua" or "Defendant").

In support thereof, Relator alleges as follows:

## INTRODUCTION

1.     Relator brings this action on behalf of the United States, as well as numerous state and local governments, pursuant to the FCA, and analogous state statutes, to recover treble damages and civil penalties arising from false and/or fraudulent records, statements, and claims made, used and caused to be made, used or presented by Aqua.

2.     In the course of her employment as Specialty Sales Representative for Aqua, Relator learned first-hand about Aqua's unlawful kickback scheme to induce dermatologists and other healthcare professionals to prescribe Aqua's products, in violation of the federal Anti-Kickback Statute and analogous state laws and statutes.

3.     Aqua's illegal scheme, and related unlawful marketing, promotional and sales practices, to induce dermatologists and other healthcare professionals to write prescriptions for Aqua's drugs by paying them as "advisors" or providing free goods and services.  As a direct result of illegal payments from Aqua, these paid dermatologists and other healthcare professionals have prescribed Aqua's drugs and influenced other physicians to do the same.

4.     Aqua's illicit scheme was and is widespread and orchestrated from the highest levels of Aqua.

3

5.      This action arises under the provisions of the FCA, and pursuant to the following

analogous provisions of state and local law:

Arkansas, Ark. Code Ann. § 20-77-901
California False Claims Act, Cal. Gov't Code § 12651 *et seq.*
California Insurance Frauds Act, Cal. Ins. Code §1871.7 *et seq.*
Colorado Medicaid False Claims Act, Rev. Stat. § 25.5-4-304 *et seq.*
Connecticut False Claims Act, Chapter 319v § 17b-301a *et seq.*
Delaware False Claims and Reporting Act, Del. Code Tit. 6, § 1201 *et seq.*
Florida False Claims Act, Fla. Stat. § 68-081 *et seq.*
Georgia False Medicaid Claims Act, Ga. Code § 49-4-168 (2007)
Hawaii False Claims Act - False Claims to the State, Haw. Rev. Stat. § 661-21 *et seq.*
Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. 175/1 *et seq.*
Illinois Insurance Claims Fraud Prevention Act, 740 Ill. Comp. Stat. 92/5 *et seq.*
Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.*
Iowa False Claims Act, Iowa Code § 685.3(2)(a) *et seq.*
Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46:437.1 *et seq.*
Maryland False Claims Act, Md. Code Ann., Health-Gen. § 2-601 *et seq.*
Massachusetts False Claims Act, Mass Laws Ch. 12, § 5(A) *et seq.*
Michigan Medicaid False Claims Act, Mich. Comp Laws Serv. § 400.601 *et seq.*
Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*
Montana False Claims Act, Mont. Code § 17-8-401 *et seq.*
Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat.
   § 357.010 *et seq.*
New Hampshire Medicaid False Claims Act, N.H. Rev. Stat. § 167:61-b *et seq.*
New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq.*
New Mexico Medicaid False Claims Act., N.M. Stat § 27-14-1 *et seq.*
New York False Claims Act, N.Y. St. Fin. Law § 187 *et seq.*
North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.*
Oklahoma Medicaid False Claims Act, 63 Okl. St. § 5053 *et seq.*
Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*
Tennessee False Claims Act, Tenn. Code § 4-18-101 *et seq.*
Tennessee Medicaid False Claims Act, Tenn. Code § 71-5-181 *et seq.*
Texas Medicaid Fraud Prevention, Tex. Hum. Res. Code § 36.001 *et seq.*
Vermont False Claims Act, 32 V.S.A. chapter 7, subchapter 8
Virginia Fraud Against Taxpayers Act, Va. Code § 8.01-216.1 *et seq.*
Wisconsin False Claims Act, Wis. Stat. § 20.931 *et seq.*
District of Columbia False Claims Act, D.C. Code § 2-308.13 *et seq.*
City of Chicago False Claims Act, Mun. Code, § 1-22-010 *et seq.*
New York City False Claims Act, Adm. Code § 7-801 *et seq.*

(collectively, "State False Claims Acts")

6.      This case arises from false or fraudulent claims for reimbursements for prescription drugs that were submitted or caused to be submitted by Defendant to government-funded programs, including, without limitation, Medicare, Medicaid, the Federal Employees Health Benefits Program, TRICARE/CHAMPUS, and the Veterans Administration in violation of the FCA. [1]

7.      Aqua's violations and its various kickback schemes corrupted the independent medical judgment of dermatologists and other healthcare professionals, unlawfully increased costs to the United States and the *Qui Tam* States for prescription drugs, and risked patients' health by improperly influencing physicians' decisions about whether to prescribe Aqua's prescription drugs.

8.      Aqua knew or should have known that its unlawful activities would cause dermatologists and other healthcare professionals to routinely file false claims for reimbursement from the federal and state governments in violation of the FCA and state and local law, and involved violations of the Food, Drug and Cosmetics Act, 21 U.S.C. § 301 *et seq.*, the Food and Drug Administration and Modernization Act of 1997, 21 U.S.C. § 351 *et seq.* and 21 U.S.C. § 360aaa *et seq.*, the federal Anti-Kickback Statute, 42 U.S.C. § 1320a *et seq.*, the Medicaid Rebate Statute, 42 U.S.C. § 1396r-8, and similar state laws.

---

[1] The federal Medicare program, as well as various state Medicaid programs, and other federally-funded programs such as TRICARE/CHAMPUS, Railroad Retirement, Federal Employees Health Benefits Program, and others are collectively referred to herein as "Federal Healthcare Programs" or "Government Healthcare Programs."   Further, each and every reference in this Complaint to Medicare and Medicaid is intended to incorporate all federally-funded programs without repeatedly identifying each of them.

9.     Because of Aqua's unlawful kickback schemes, patients receiving Aqua's prescription drugs received no assurance that their dermatologists and other healthcare professionals were exercising their independent and fully-informed medical judgment.

10.     Aqua's unlawful kickback schemes and other illegal marketing practices resulted in substantial loss to the federal and state governments.

## JURISDICTION AND VENUE

11.     This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

12.     This Court has supplemental subject matter jurisdiction over Aqua's violations and the counts relating to the State False Claims Acts pursuant to 28 U.S.C. § 3732(b) because Aqua's violations of the State False Claims Acts and the federal FCA arise out of a common nucleus of operative fact. *See also* 31 U.S.C. § 3732(b) (granting district courts jurisdiction over any action brought under the laws of any state for the recovery of funds paid by a state if the action arises from the same transaction or occurrence as an action brought under the federal FCA).

13.     Venue for this action is predicated on 31 U.S.C. § 3732(a) which provides that "any action brought under § 3730 may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act prescribed by § 3729 occurred."

14.     At all times relevant to this Complaint, Defendant Aqua  resided in, maintained permanent employees in, and transacted a substantial amount of business in the Eastern District of Pennsylvania, and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District. Accordingly, Aqua is subject to personal jurisdiction in this State, also.

## PRELIMINARY STATEMENT

15.     This suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, administrative hearing, lawsuit, investigation or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

16.     To the extent that there has been a public disclosure unknown to Relator, Relator is an original source under 31 U.S.C. § 3730(e)(4).  Relator has direct and independent knowledge of the information on which the allegations are based.

17.     Under the False Claims Act, this Complaint is to be filed *in camera*, remain under seal for a period of at least sixty (60) days and shall not be served on the Defendant until the Court so orders.  The government may elect to intervene and proceed with the action within sixty (60) days after it receives both the Complaint and the material evidence and information.

18.     As required by the FCA, 31 U.S.C. § 3730(b)(2), prior to filing this Complaint, Relator provided material evidence and information to the United States Attorney for the U.S. District Court for the Eastern District of Pennsylvania.

19.     As required by the FCA, 31 U.S.C. § 3730(b)(2), Relator will provide to the Attorney General of the United States and to the United States Attorney for the U.S. District Court for the Eastern District of Pennsylvania a statement of substantially all material evidence and information related to this Complaint. This disclosure statement is supported by evidence establishing the existence of false claims caused by Aqua.

20.     Relator has direct and independent knowledge of the kickback scheme and other illegal marketing schemes to cause the submission of false claims that is set forth in this Complaint and brings this action on behalf of herself and the United States pursuant to the relevant provisions of the FCA.

## PARTIES

21.     Plaintiff John Doe previously worked as a Specialty Sales Representative for Defendant Aqua.

22.     Defendant Aqua Pharmaceuticals Holdings, LLC ("Aqua") is a Pennsylvania Limited Liability Company with its principal executive offices located at 158 West Gay Street, Suite 310, West Chester, Pennsylvania 19380.

23.     Aqua is a specialty pharmaceutical company focused on acquiring, developing and marketing branded, prescription dermatology products.   Aqua claims that it has a portfolio of "well-known and growing brands in acne, steroid-responsive dermatoses, seborrheic dermatitis, actinic keratosis and atopic dermatitis.

24.     Internally, Aqua states that it "cover[s] 51% of all dermatologists" in the United States.  The company was co-founded in 2004 by Craig Ballaron and Jay Gooding.

25.     RoundTable Healthcare Partners ("RoundTable"), a private equity firm focused exclusively on the healthcare industry, acquired a majority interest in Aqua in June 2010. RoundTable is headquartered in Lake Forest, Illinois.

26.     In December 2013, RoundTable sold Aqua to Almirall, S.A. ("Almirall") for more than $402 million in cash, according to published reports.  Almirall, which is headquartered in Barcelona, Spain, is a global pharmaceutical company that has more than 3,000 employees in 23 countries, and generated total revenues of €825 million in 2013.  Almirall's stock is traded on the Spanish stock exchange.

27.     At all times relevant hereto, Aqua acted through its agents and employees, and the acts of Aqua's agents and employees were within the scope of their agency and employment.

The policies and practices alleged in the Complaint were, upon information and belief, established and/or ratified at the highest corporate levels of Aqua.

28.     Knowingly paying kickbacks to physicians to induce them to prescribe a prescription drug on-label or off-label (or to otherwise infleuence physician prescriptions) for individuals who seek reimbursement for the drug from a Government Healthcare Program or causing others to do so, while certifying compliance with the federal Anti-Kickback Statute (or while causing another to so certify), or billing the Government as if in compliance with these laws, violates the FCA and similar state False Claims Acts.

## FACTUAL BACKGROUND

## STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO AQUA'S FALSE CLAIMS

### A.     Government Health Programs

29.     Federal, state and local governments, through their Medicaid, Medicare, Tricare, Veteran's Administration and other Government healthcare payors, are among the principal purchasers of Aqua's pharmaceutical products (individual States' Federal Government Health Programs are hereinafter referred to as the "Medicaid Program").

30.     Medicare is a federal government health program primarily benefiting the elderly which Congress created in 1965 when it adopted Title XVIII of the Social Security Act. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS").

31.     Congress created Medicaid at the same time it created Medicare in 1965 when Title XIX was added to the Social Security Act.  Medicaid is a public assistance program providing payment of medical expenses to low-income patients.  Funding for Medicaid is shared between the federal government and state governments.  The federal government also separately matches certain state expenses incurred in administering the Medicaid program.  While specific

Medicaid coverage guidelines vary from state to state, Medicaid's coverage is generally modeled after Medicare's coverage, except that Medicaid usually provides more expansive coverage than does Medicare.

32.     Medicaid has broad coverage for prescription drugs, including self-administered drugs.  Nearly every state has opted to include basic prescription drug coverage in its Medicaid plan.

33.     Tricare is the health care system of the United States military, designed to maintain the health of active duty service personnel, provide health care during military operations, and offer health care to non-active duty beneficiaries, including dependents of active duty personnel and career military retirees and their dependents.  The program operates through various military-operated hospitals and clinics worldwide and is supplemented through contracts with civilian health care providers.  Tricare is a triple-operation benefit program designed to give beneficiaries a choice between health maintenance organizations, preferred provider organizations and fee-for-service benefits.  Five managed care support contractors create networks of civilian health care providers.

34.     While Tricare treats active duty military and their dependents, the Veterans Administration ("VA") provides health care and other benefits to veterans of the military through its nationwide network of hospitals and clinics.

35.     The Federal Employees Health Benefits Program ("FEHBP") provides health insurance coverage for more than eight million federal employees, retirees, and their dependents. FEHBP is a collection of individual health care plans, including the Blue Cross and Blue Shield Association, Government Employees Hospital Association, and Rural Carrier Benefit Plans. FEHBP plans are managed by the Office of Personnel Management ("OPM").

**B.** **The Federal False Claims Act, 31 U.S.C. § 3729 *et seq.***

36.     The FCA, 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting or causing to be presented, any false or fraudulent claim for payment or approval a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

37.     The FCA, 31 U.S.C. § 3729(a)(1)(B), makes "knowingly" making, using, or causing to be made or used, a false record or statement that is material to a false or fraudulent claim a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

38.     The FCA, 31 U.S.C. § 3729(a)(1)(G), makes it illegal for any person to "knowingly" make, use or cause to be made or used a false record or statement that is material to an obligation to pay or transmit money or property to the Government, or to knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the Government, a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

39.     The FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested. 31 U.S.C. § 3729(b)(2).

40.     The FCA, 31 U.S.C. § 3729(b)(1), provides that "(1) the terms 'knowing' and 'knowingly' --- (A) mean that a person, with respect to information --- (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud."

41.     The FCA, 31 U.S.C. § 3729(b)(4), provides that "(4) the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."

42.     The States that are party to this Complaint have enacted statutes similar to the FCA that apply to Medicaid fraud and/or fraudulent health care claims submitted for payment by municipal funds

**C.     The Federal Anti-Kickback Statute, 42 U.S.C. § 1320a**

43.     The federal healthcare Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)) ("AKS") arose out of Congressional concern that payoffs to those who can influence healthcare decisions will result in goods and services being provided that are medically inappropriate, unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of federal healthcare programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickbacks actually gives rise to overutilization or poor quality of care.

44.     The Anti-Kickback Statute prohibits knowing and willful solicitation, offer, payment or receipt of any remuneration, whether direct or indirect, overt or covert, in cash or in kind, in return for or to induce (a) referring or influencing the referral of an individual for the

furnishing of any item or service or (b) purchasing, leasing or arranging or recommending for the purchase, lease or ordering of any item or service.

45.     The Anti-Kickback Statute applies to any referrals for items or services payable by any Federal Healthcare Program.

46.     The Anti-Kickback Statute is violated when remuneration is paid purposefully to induce referrals of items or services paid for by a Federal Healthcare Program. By its terms, the statute ascribes liability to parties on both sides of an impermissible "kickback" transaction. For purposes of the anti-kickback statute, "remuneration" includes the transfer of anything of value, in cash or in-kind, directly or indirectly, covertly or overtly.

47.     Compliance with the Anti-Kickback Statute is a precondition to participation as a healthcare provider under Medicare and other federal healthcare programs.   With regard to Medicare, any physician or other healthcare provider who wishes to participate in the program must submit an Enrollment Application which contains a Certification Statement that specifically requires that the provider comply with the federal Anti-Kickback Statute as a condition to receiving reimbursement under the Medicare program. *See, e.g.*, Forms CMS-855b; CMS-855S.

48.     Violation of the Anti-Kickback Statute subjects the violator to exclusion from participation in Federal Healthcare Programs (including Medicare and Medicaid), civil monetary penalties of up to $50,000 per kickback violation, and imprisonment of up to five years per violation. 42 U.S.C. §§ 1320a-7a(a)(7), 1320a-7b(b).

49.     As detailed herein, Defendant devised a scheme whereby it paid kickbacks to physicians in the form of cash and cash equivalents with the specific aim of increasing the usage of its prescription drugs.

## SPECIFIC ALLEGATIONS OF AQUA'S FALSE CLAIMS

A.  **Background Relating to Aqua's Prescription Drugs**

50.  Aqua promotes five brands throughout the United States including

    a.  Monodox® (doxycycline monohydrate) capsules, an antibiotic used to treat acne;

    b.  Cordran® lotion, ointment and cream, a topical corticosteroid used for the relief of inflammatory dermatoses;

    c.  Fluoroplex® (fluorouracil) cream, indicated for the treatment of actinic keratoses;

    d.  Xolegel® (ketoconazole) Gel, for the treatment of seborrheic dermatitis;

    e.  Verdeso® (desonide) foam, used to treat steroid responsive dermatoses; and

    f.  ACTICLATE® (doxycycline hyclate USP) tablets are indicated for adjunctive therapy in severe acne.

51.  Relator was primarily responsible for "detailing" Cordran lotion, ointment and cream and Xolegel in her time at Aqua.  Relator also promoted and marketed ACTICLATE for a few months after it was launched.

52.  Aqua's revenue relies almost exclusively upon decisions by dermatologists and Physicians Assistants to prescribe Aqua products to the provider's patients, instead of products sold by one of Aqua's competitors.

53.  Since at least February 2013, and, upon information and belief, for years before that, Aqua has offered, and continues to offer, substantial, illegal financial inducements to dermatologists and other healthcare professionals to induce them to prescribe or use Aqua's prescription drugs.

14

**B.** **Aqua's Misconduct and Illegal Schemes, Including Numerous Kickbacks To Prescribing Providers**

    **a.** **Relator Begins Her Employment With Aqua And Immediately Is Asked To Participate In Illegal Conduct**

53.     Relator began working for Aqua in February 2013 as a Specialty Sales Representative.

54.     Within three months, two Physician Assistants–Certified ("PA-C" or "PA") from one dermatology practice in suburban Philadelphia asked Relator for gift cards and meals for their families, including meals on days they were not working.

55.     Both PAs (hereinafter "PAH" and "PAM") were also "Advisors" for Aqua, and both PAH and PAM were substantial prescribers of Aqua products.  Indeed, Relator believes that PAM had been provided, at some point before January 2011, an Aqua company credit card that she was permitted to use to buy items for herself and the dermatology practice.  Aqua would pay the bills for that credit card.

56.     The two PA's also asked Relator to ensure that Aqua would cater meals for various family events (i.e., christenings, family parties).

57.     Relator immediately asked her manager, who was serving two roles – Senior Regional Sales Manager, East and Assistant Director, Trade Relations - in the company, if this conduct was appropriate and/or legal.

58.     Relator's manager stated that the practice was approved by Aqua and Relator should comply with the PA's numerous requests.

59.     Relator's manager added that it was especially important to assist these two PAs, as well as one of the doctors in the same dermatology practice, because all three were "Advisors" for Aqua.  This particular dermatology practice has multiple locations in Eastern Pennsylvania, including offices in Hazleton, Pennsylvania, Norristown, Pennsylvania and the Roxborough

15

section of Philadelphia, all of which served a patient population that, upon information and belief, is highly populated by beneficiaries that are insured by Medicaid. All three prescribers (the two PA's and the prescribing doctor) were consistently three of the highest prescribers in Relator's territory.

60.     Based on her conversation with her manager, Relator felt like her job was in jeopardy if she did not comply with these requests. In fact, PAM informed Relator that she did not like or get along with the previous Aqua sales representative and that PAM complained about her and the sales representative was fired.

61.     After Relator's conversations with her manager, Relator bought gift cards for PAH and paid for catered lunches and dinners for PAM. Relator had meals delivered to PAM's house on numerous occasions, and still possesses many of these receipts.

62.     For example, Aqua paid for the catering at the christening of one of PAM's son's, which was held at PAM's home. In order to conceal this payment for a private meal on a weekend, Relator was permitted by Aqua management to prepay for the meal on a Friday, but have the meal delivered to PAM's home over the weekend. The receipt would show that the meal was delivered to PAM's home and the date of purchase.

63.     Both Relator's manager, as well as the Director of Human Resources (who has recently been promoted), approved such a payment.

64.     Aqua never required its sales representatives to submit the actual itemized receipts when seeking reimbursement for gifts cards, lunches or other kickback items. Aqua simply instructed Relator, and other sales representatives, to submit a total on an expense report, and to ensure that the total figure was not an "even number."

65.    Similarly, Aqua never required its sales representatives to provide attendee lists for events.[2]

66.    Relator's manager knew about and reviewed all of these payments and subsequent expense reports, and approved them for reimbursement.

67.    Both PAM and PAH heavily prescribed Aqua's products.

68.    Relator also had a sales representative counterpart ("Sales Rep 1") when she began with Aqua.  Sales Rep 1 was also asked to participate in the same misconduct that Relator participated in.  Although Sales Rep 1 had a different manager then Relator, that manager was also aware of and approved the same type of requests.

69.    In Fall 2013, Sales Rep 1 resigned from Aqua; she complained that she had been "abused" by PAH and PAM and did not want to continue the misconduct.

70.    Relator worked from October 2013 through December 2013 without a sales representative counterpart.  She continued to provide gifts cards and other free goods to many of her accounts.

b.    **Relator Receives A New Sales Counterpart And Wrongdoing Continues**

71.    In December 2013, Aqua assigned a new sales representative counterpart to Relator.

72.    Relator was asked to train her second counterpart ("Sales Rep 2") and to introduce him to her biggest accounts and providers.

---

[2] Soon after Almirall's purchase of Aqua, Aqua management instructed its sales representatives to correct all previous reporting violations for the prior year per Almirall's instructions.  Every sales representative and manager was given two days of "vacation" to revise and modify their expense reports, and invent and/or rewrite attendee lists for speaking events from the prior year. Similarly, Almirall required Aqua to instruct the sales representatives to examine, and, if necessary, to create the number of pens and pads that each sales representative had provided to its accounts in the previous several months.

73. Sales Rep 2 witnessed Relator giving gift cards to several Aqua advisors for Christmas. These gift cards included cards from Wegmans (grocery store) and Dick's Sporting Goods.

74. Sales Rep 2 was shocked that Relator could give out gift cards, and Relator explained that she had been directed to give out the gift cards.

75. In early 2014, PAH and PAM both approached Sales Rep 2 and they asked him to furnish them both with gift cards.

76. Sales Rep 2 immediately contacted his manager (the same manager as Sales Rep 1), and the Aqua manger confirmed that Sales Rep 2 should purchase gift cards for the two PAs.

77. Relator and Sales Rep 2 realized in mid-January 2013 that PAH and PAM were consuming a considerable amount of the sales representative's respective monthly marketing budgets.[3] Accordingly, Relator and Sales Rep 2 decided to cut back on the amount of gift cards and meals provided to PAH and PAM.

78. Soon after that decision, Sales Rep 2 received an email from PAM asking him to bring lunch to her dermatology practice. Sales Rep 2 agreed to bring this lunch, but also told PAM that he was going to have to cut back to lunches every other week.

79. When Sales Rep 2 then tried to meet with PAM and deliver samples during his visit to the dermatology practice, PAM refused to meet with him because Sales Rep 2 refused to provide lunch every week.

---

[3] Each Aqua sales representative was provided with $1,250 per month for promotional marketing. However, Relator will testify that she often went over the budget and was consistently approved for such an overage.

80.     For the next several weeks, Relator and Sales Rep 2 alternated delivering lunch to PAH and PAM's dermatology practice every other week.  PAH and PAM continued to prescribe a substantial amount of Aqua product.

81.     Also, both Relator and Sales Rep 2 continued to purchase gift cards for PAH.

**c.  Aqua Management Attempts To Retreat From Its Sales Practices To No Avail**

82.     In or about early March 2014, Sales Rep 2 attended a "round table dinner" in Center City Philadelphia.  Harold Farber, M.D., who is a top "Advisor" for Aqua, was the speaker. Dr. Farber is a board-certified dermatologist with offices in Philadelphia and Narberth, Pennsylvania.

83.     However, the event was not attended by a single other healthcare professional – those in attendance consisted solely of Dr. Farber, Sales Rep 2 and Roger Sharp, Aqua's National Director of Sales.

84.     Even though no other healthcare professional attended the dinner, and he did not discuss or present any educational materials, Dr. Farber was still paid a substantial honorarium.

85.     Aqua currently pays physicians anywhere from $1,000 to $2,500 for each speaker program.  Aqua disguise these payments as "honorarium" so that Aqua can feign compliance with federal, state and city kickback laws.

86.     Dr. Farber, Roger Sharp and Sales Rep 2 then went to an expensive dinner (approximately $700-800 for the three of them), which Aqua paid for.

87.     The sole purpose of this program was simple – Dr. Farber writes prescriptions for patients that can use Aqua's products, and the program was to induce Dr. Farber to continue to write scripts for Aqua products by lining his pockets with sham honorarium and providing him with expensive meals.

88.     During dinner, Mr. Sharp asked Sales Rep 2 if Sales Rep 2 ever purchased gift cards for his accounts or Aqua's providers.

89.     Sales Rep 2 told Mr. Sharp that he often purchased gift cards for Aqua Advisors and providers; Sales Rep 2 also provided names of many of these individuals, including Dr. Farber, to Mr. Sharp.

90.     Mr. Sharp informed Sales Rep 2 to stop purchasing gift cards for Sales Rep 2's accounts.  Mr. Sharp, Aqua's Director of Sales, then added that Sales Rep 2 was not in trouble because Aqua management had previously directed him to purchase these cards.

91.     Mr. Sharp also instructed Sales Rep 2 to stop providing meals for PAM at her home, and that Sales Rep 2 should only provide lunch at providers' offices.

92.     After the meeting, Mr. Sharp contacted Relator's superior and Sales Rep 2's manager and explained his instructions to cease purchasing gift cards.

90.     Mr. Sharp also contacted Tony Cavallo, the Executive Director of Aqua's Provider Liaison Department.  Mr. Cavallo managed Aqua's speakers and advisors.

91.     Upon information and belief, Mr. Sharp instructed Mr. Cavallo to meet with PAM and let her know that Aqua would no longer be providing gift cards.

92.     Upon information and belief, after that meeting, PAM was furious and demanded that Sales Rep 2 be fired.  PAM also had PAH and one of the dermatologists at the practice, who was also an Advisor for Aqua, contact Mr. Cavallo and complain about Sales Rep 2.

93.     Relator can confirm that Mr. Cavallo and Relator's own manager supported Sales Rep 2 in public; however, in private, Mr. Cavallo and Relator's manager were very upset with Sales Rep 2 for creating such an issue with such important advisors of the company.  Indeed,

during calls with Relator's manger and Mr. Cavallo after this incident, both Aqua managers

called Sales Rep 2 "a complete idiot" and "clueless" for reporting this misconduct to Mr. Sharp.

94.     Relator's manager was further concerned that Sales Rep 2 would report this

information to government officials or outside lawyers.

95.     In April 2014, Aqua circulated an email with new "Promotional Guidelines Policy

and Procedures" that specifically prohibited such items as gift cards and lunches being conducted

in offices.

96.     From May 2014 through August 2014, Relator was on maternity leave.  During

that time frame, Sales Rep 2 "detailed" Relator's products to Relator's accounts.

97.     On or about August 18, 2014, shortly after her return from maternity leave,

Relator received a text message from PAM asking Relator to resume providing gift cards or

figure out some other way to provide benefits to PAM and PAH.  Relator responded that she

needed to speak with her manager since the new guidelines were in place.

98.     Relator was surprised because she believed that the conduct had stopped after the

new guidelines had been put in place. However, Relator soon learned that Sales Rep 2 had been

providing free goods to PAH and PAM while Relator was on maternity leave, despite the new

guidelines.

99.     Relator attended an Aqua sales meeting relating to the launch of ACTICLATE® in

Orlando, Florida on August 25, 2014, which was intended to last for 3 days.[4]

100.    On August 27, 2014, while Relator was still at the ACTICLATE sales meeting,

PAM called Relator's manager and complained that Relator was not "taking care" of PAM and

---

[4] ACTICLATE was approved by the FDA in July 2014.  It is a new formulation of doxycycline, and available as a tablet.  The market for branded, oral antibiotics to treat skin conditions is estimated at more than $795 million.

PAH. As PAM had done with Sales Rep 2, PAM was complaining that Relator was not providing them with appropriate benefits to purchase Aqua products.

101.    Relator's sales manager confronted Relator, and Relator showed her manager the text PAM had sent to Relator on August 18th. Relator had previously tried to get her manager to deal with PAM.

102.    Relator's manager, rather than instructing Relator to ignore PAM and supporting Relator, asked Relator what Relator could do to help PAM. Sales Rep 2 and Aqua's Director of Marketing witnessed this conversation.

103.    After this conversation, Relator felt that she was required to violate the law in order to complete her job. While Relator was pleased by the company's new guidelines in Spring 2014, she soon realized that it was "business as usual" at Aqua.

104.    Accordingly, on September 2, 2014, Relator resigned from Aqua due to her unwillingness to work for a company that required her to perform illegal acts.

105.    That same day, Sales Rep 2 attended an Advisory Board meeting at Seasons 52 restaurant in King of Prussia, Pennsylvania. The speaker, Harold Milstein, M.D., an Aqua Advisor, received an honorarium for speaking at the event.

106.    All attendees at the meeting received $200 for attending.

107.    Each Aqua sales territory has its own advisors and speakers. Similar to Relator's territory, these advisors receive honorariums for lunches, dinners, and traveling to advisory meetings, and separate monthly honorariums for completing surveys.

108.    Thus, Aqua's scheme involved offering and providing substantial, illegal financial inducements to dermatologists and other healthcare providers, as described in more detail above, include:

a.      Providing gift cards from the following entities, among many others, Wegmans, Dick's Sporting Goods, Outback Steakhouse, Panera, Justice (children's clothing; *i.e.*, for PAH around Christmas time for gifts) to providers, including Advisors;

b.      Providing meals to providers and their families, and providing meals for providers' family events from the following entities, among many others, Shop Rite (*i.e*, PAM would often demanded food and/or drinks for her son's Boy Scout meeting), Cheesecake Factory (*i.e.*, PAM would often order meals from Cheesecake Factory, which Relator and Sale Rep 2 would deliver because Cheesecake Factory did not deliver), Crocodile Rocks, WholeFoods (*i.e.*, a specialty grocery store that carried a certain type of protein bars one of the Advisors liked);

c.      Providing gift baskets or other items to providers, including gift baskets from Marshall's or sporting goods from Dick's;

d.      Instructing sales representatives to use parking receipts to reimburse doctors for filing prescriptions;

e.      Providing payments to speakers at programs where there were no attendees present;

f.      Providing substantial honorariums to speakers and advisors for lunches, dinners and traveling to advisory meetings;

g.      Providing substantial monthly honorariums to speakers and advisors for completing surveys;

h.      Providing payments for advisors from across the country to attend numerous informational webinars during the course of the year;

i.      Paid certain advisors (*i.e.*, Barry Solomon, M.D., from New York) to participate in a video for Aqua's National Sales Meeting in Winter 2013);

j.      Developing a program called the "Early Experience Program" for the ACTICLATE launch in Summer 2014, whereby ACTICLATE samples were provided to certain high prescribing providers and advisors before the sales representatives were trained on it or before it was formally launched;

k.      Providing $1,000 payments to certain high-volume advisors from across the country for attending a 40-minute webinar on ACTICLATE; and

l.      Providing $200 to healthcare professionals for attending an Advisory Board meeting relating to ACTICLATE at nationwide locations.

109.   Aqua's network of "advisors" and/or illegal speaker programs is widespread and involves dermatologists and other healthcare professionals throughout the United States.  Aqua's "advisors" include, but are not limited to, the following:

a.   Dr. J.A. (Strongsville, OH);
b.   Dr. N.A. (Hudson, OH);
c.   Dr. R.A. (Oakbrook, IL);
d.   Dr. S.A. (Brownston Twp., MI);
e.   PA An.B. (Hinsdale, IL);
f.   Dr. Am.B. (Evanston, IL);
g.   PA B.B. (Phoenix, AR)
h.   PA C.B. (Webster, TX);
i.   Dr. J.B. (Glenview, IL);
j.   Dr. J.B. (Boynton Beach, FL);
k.   Dr. K.B. (Newport Beach, CA);
l.   Dr. A.C. (Long Beach, NY);
m.   PA A.C. (Dallas, TX);
n.   Dr. C.C. (Ridgewood, NJ);
o.   Dr. D.C. (Austin, TX);
p.   PA E.C. (Westminster, MD);
q.   Dr. L.C. (Houston, TX);
r.   Dr. M.C. (Twinsburg, OH);
s.   Dr. T.C. (Rockville, MD);
t.   Dr. J.D. (Boston, MA)
u.   Dr. J.D. (Las Vegas, NV);
v.   Dr. H.F. (Narberth PA);
w.   Dr. J.F. (Round Rock, TX);
x.   Dr. L.F. (Chicago, IL);
y.   Dr. L.F. (Willow Grove, PA);
z.   PA L.F. (Joliet, IL);
aa.   Dr. C.G. (Hackensack, NJ);
bb.   Dr. F.G. (Grapevine, TX);
cc.   PA K.G. (Gilbert, AZ);
dd.   Dr. M.G. (East Lyme, CT);
ee.   Dr. M.G. (Pasadena, TX);
ff.   Dr. M.G. (Metairie, LA);
gg.   Dr. R.G. (San Ramon, CA);
hh.   Dr. S.G. (Wyandotte, MI);
ii.   PA S.G. (Beverly Hills, CA);
jj.   Dr. D.H. (Arlington, TX);
kk.   Dr. F.H. (Atlanta, GA);
ll.   PA L.H. (Fort Worth, TX);
mm.   Dr. L.H. (Cypress, TX);
nn.   Dr. S.H. (Philadelphia, PA);

oo.     Dr. S. H. (Houma, LA);
pp.     NP L.J. (Brooklyn, NY);
qq.     Dr. M.J. (Brooklyn, NY);
rr.     Dr. A.J. (Nashville, TN);
ss.     Dr. M.K. (Chesterfield, MO);
tt.     Dr. P. K. (Jacksonville, FL);
uu.     Dr. D.K. (Florham Park, NJ);
vv.     Dr. L.K. (Beverly Hills, CA;
ww.     Dr. P.L. (Pasadena, TX);
xx.     Dr. S.L. (York, Pa);
yy.     Dr. K.L. (Henderson, NV);
zz.     PA L.M. (McKinney, TX);
aaa.    Dr. M.M. (Katy, TX);
bbb.    PA O.O. (Chico, CA);
ccc.    PA P.M. (Addison, TX);
ddd.    Dr. I.P. (Flower Mound, TX);
eee.    PA B.P.(Southlake, TX);
fff.    NP R.P. (Evansville, IL);
ggg.    Dr. C.R. (San Antonio, TX);
hhh.    Dr. C.R. (Sterling Heights, MI);
iii.    Dr. B.S. (Fort Mill, SC);
jjj.    Dr. B.S. (Smithtown, NY);
kkk.    PA E.S. (Lakewood, CA);
lll.    PA I.S. (Middle Island, NY);
mmm.    Dr. J.S. (Fort Wayne, IN);
nnn.    Dr. K.S. (Webster, TX);
ooo.    PA L.S. (Olathe, KS);
ppp.    Dr. S.S. (Gilbert, AZ);
qqq.    Dr. S.S. (Weston, FL);
rrr.    PA D.T. (Newport Beach, CA);
sss.    Dr. S.T. (Houston, TX);
ttt.    PA H.U. (Crown Point, IN);
uuu.    PA D.W. (Scottsdale, AZ);
vvv.    Dr. G.W. (Weston, FL);
www.    Dr. J.W. (Simi Valley, CA);
xxx.    Dr. M.W. (McKinney, TX);
yyy.    Dr. R.W. (Frisco, TX); and
zzz.    Dr. J.Z. (Brooklyn, NY).

110.    Aqua's network of "advisors" in the Philadelphia area include, but are not limited to, the following:

a.      Harold Farber, MD (Philadelphia, PA);

b.      Katheryn Gilbert, PA-C (Bryn Mawr, PA);

c.      Sarah Humbarger, PA-C (Bala Cynwyd, PA);

      d.     Lori Finelli, DO (Willow Grove, PA);

      e.     Sarah Malstrom, PA-C (Bala Cynwyd, PA);

      f.     Harold Milstein, MD (Bala Cynwyd, PA);

      g.     Neh Onumah, MD (New Hope, PA/East Windsor, NJ); and

      h.     Carly Soda, PA (Sellersville, PA).

111.    Aqua, on a nationwide basis, caused many thousands of prescriptions to be written as a result of payments and/or other remuneration made in connection with its kickback scheme and advisor/speaker program. Upon information and belief, Aqua paid millions of dollars in kickbacks to dermatologists and other healthcare professionals in the form of honoraria and/or other remuneration.

112.    Aqua is liable to the Government for damages based on the payment of the above claims and all other claims submitted to the Government Healthcare Programs for prescriptions written by these dermatologists and other healthcare professionals for the company's prescription drugs beginning from the time they began receiving payments or other remuneration and continue to date, because the claims were the result of prescriptions induced by the payments or other remuneration.

113.    Compliance with the AKS is a precondition of payment by virtue of federal and state statutes, regulations, provider agreements and contracts.

114.    By providing remuneration to dermatologists and other healthcare professionals, Aqua intended to induce those physicians to prescribe Aqua's prescription drugs. It was reasonably foreseeable that some of those prescriptions would be for federal healthcare program beneficiaries and that claims for those prescriptions would be submitted to Government Healthcare Programs. Thousands of such prescriptions or claims from across the United States

based on such prescriptions were, in fact, submitted to and paid by the Government Healthcare Programs.

115.   The decision-making of the physician, a critical element in Government Healthcare Programs coverage policy, was completely undermined by the unlawful marketing schemes of Aqua.  The physicians prescribing the drugs did not necessarily do so because they believed, based on their review of peer-reviewed medical literature, or discussions with their colleagues, that the drugs would help their patients; rather the drugs were often prescribed because the physicians were actively pursued and enticed by Aqua with its kickback scheme.

116.   Relator is aware of sales representatives from the following regions participating in the identified misconduct:

    a.   Manhattan, New York City - Providing gift cards to numerous providers and advisors;

    b.   White Plains, NY – Paying for lunches at a provider's office when the sales representative was not present;

    c.   New Jersey (multiple representatives) – Providing numerous gift cards to providers and advisors, as well as providing lunches at a provider's office when the sales representative was not present; and

    d.   California – Sales representative would use her manager's company credit card to pay for dinners for providers and advisors when neither manager, nor representative, was present.

117.   Relator alleges that the misconduct and kickback scheme described above are part of a nationwide scheme by Aqua to increase its drugs' sales and market growth.

    **d.   Other Aqua Marketing Schemes**

118.   At the time of Relator's resignation, Aqua was utilizing two programs to increase sales:

    a.   Aqua Rx Direct program in conjunction with Irmat Pharmacy; and

    b.   Savings coupon cards.

27

119.     Irmat Pharmacy is an online pharmacy that specializes in dermatological products.  Aqua has partnered with Irmat and at least one other online pharmacy to process prescriptions and mail Aqua products to patients.

120.     Aqua has instructed its sales representatives to urge dermatologists and other healthcare professionals to utilize only Irmat.

121.     One of the advantages of the Aqua Direct Rx Program was to demonstrate to dermatologists and other healthcare professionals how beneficiaries could avoid any co-pay by utilizing an "Aqua Rx Direct pharmacy" such as Irmat.

122.     Irmat also made a commitment to dispense only "branded" Aqua product, not the generic equivalent and to dispense Aqua products without requiring a co-pay.  Every product Aqua marketed, except for ACTICLATE, had at least one generic equivalent and many had several generic equals.

123.     Aqua instructed its sales representatives to host "Rx Cycle Programs", which were "designed specifically for providers and [nurse practitioners and physician assistants] that discuss the Aqua Rx Direct program with pharmacy partners in attendance."

124.     The idea was to "increase sales, with reduced utilization of coupons and rebates."

125.     Aqua also uses Irmat to mail samples directly to dermatologists and other healthcare professionals.

126.     Upon information and belief, certain dermatologists or other healthcare professionals that prescribe Aqua drugs also have an ownership share in Irmat Pharmacy.

127.     Further, in violation of federal rules and regulations, Aqua promotes money-off coupons to its dermatologists and other healthcare professionals.

128.    Aqua sales representatives received a weekly "Savings Card Report" from the Sales Department management, which showed the number of savings cards used in each territory by week.

129.    Upon information and belief, Irmat mailed out these samples for Aqua.

130.    Aqua sales representatives were instructed to leave piles of savings cards at popular pharmacies in their territory so that they were available to patients and pharmacists if the patient forgot to bring his or her card.

131.    Relator was slightly aware of a scheme that was used by the Aqua sales representatives who marketed Monodox, whereby patients and pharmacies could avoid the necessity of requiring prior authorizations by contacting McKesson Corp, a drug wholesaler directly on a direct number provided by Aqua.

### COUNT I
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B)

132.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

133.    This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729 et seq., as amended.

134.    During the relevant period, and by virtue of the acts described above, Aqua presented or caused to be presented numerous false or fraudulent claims for payment to the United States Government through Medicare and Medicaid.

135.    During the relevant period, and by virtue of the acts described above, Aqua knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the United States Government to approve or pay such false and fraudulent claims.

136.   Aqua provided illegal remuneration to dermatologists and other healthcare professionals to induce improper prescriptions for Aqua's prescription drugs to beneficiaries of federally-funded healthcare programs in violation of the federal Anti-Kickback Statute.

137.   Claims that arise from Aqua's kickback scheme are false, and violate the False Claims Act, because they are a result of a kickback – no further express or implied false statement is required to render such infected claims false, and none wash the claim clean.

138.   Aqua's violations of the federal Anti-Kickback Statute give rise to liability under the federal FCA.

139.   Aqua violated the federal FCA by submitting, or causing to be submitted, claims for reimbursement from federal healthcare programs, including Medicare and Medicaid, knowing that those claims were negligible for the payments demanded due to federal Anti-Kickback Statute violations associated with illegal remuneration paid to dermatologists and other healthcare professionals.

140.   Each prescription that was written as a result of Aqua's illegal inducements represents a false or fraudulent record or statement.

141.   Each claim for reimbursement for illegally inducted prescriptions submitted to a federal health insurance program represents a false or fraudulent claim for payment.

142.   Relator cannot at this time identify all of the false claims for payment that were caused by Aqua's conduct.   The false claims were presented by thousands of separate dermatologists and other healthcare professionals, across the United States, and over many years. Relator has no control over such entities, and has no access to the records in her possession.

143.     The Government, unaware of the falsity of the records, statements and claims made or caused to be made by the Aqua, paid and continue to pay the claims that are non-payables as a result of Aqua's illegal kickbacks, and therefore false under the federal FCA.

144.     By reason of Aqua's acts, the United States suffered damages, and continues to suffer damages, as a result of false claims by Defendant and is entitled to recover its losses and otherwise obtain relief available under the FCA.

145.     All of Aqua's conduct described in this Complaint was knowing, as that term is used in the federal FCA.

## COUNT II
### Federal False Claims Act, 31 U.S.C. § 3729(a)(l)(G)

146.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

147.     This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729 et seq., as amended.

148.     Through the acts and misconduct described above, Defendant knowingly made, used, or caused to be mad or used, false records or statements material to an obligation to pay or transit money to the Government, and knowingly concealed, avoided, or decreased an obligation to pay or transmit money or property to the Government, within the meaning of 31 U.S.C. § 3729(a)(1)(G) (this provision replaces 31 U.S.C. § 3729(a)(7), which was in effect until the FCA was amended on May 20, 2009).

149.     As a result, the United States, unaware of the fraudulent conduct of Aqua, paid and continues to pay claims that would not be paid but for Aqua's unlawful conduct.

150.     By reason of Aqua's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

31

## COUNT III
### Arkansas Medicaid Fraud False Claims Act, Ark. Code Ann. § 20-77-901

151.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

152.   This is a claim for treble damages and civil penalties under the Arkansas Medicaid Fraud False Claims Act, Ark. Code Ann. § 20-77-901.

153.   By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Arkansas Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

154.   The Arkansas Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

155.   By reason of these payments, the Arkansas Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT IV
### California False Claims Act, Cal. Gov't Code § 12651 *et seq.*

156.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

157.   This is a claim for treble damages and civil penalties under the California False Claims Act, Cal. Gov't Code § 12651 *et seq.*

158.   By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the California Medicaid Program (i.e., Medi-Cal) false or fraudulent claims for payment or approval and/or knowingly

accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

159.    The California Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

160.    By reason of these payments, the California Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT V
**California Insurance Frauds Prevention Act, California Insurance Code § 1871.7**

161.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

162.    This is a claim for treble damages and penalties under the California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7, as amended (referred to in this Count as "the Act"). The Act provides a civil cause of action against any person who commits the crime of insurance fraud or who offers or pays illegal inducements or kickbacks to secure benefits under a contract of insurance. Cal. Ins. Code §1871.1(e).

163.    The Act provides for civil recoveries against persons who violate the provisions of California Penal Code sections 549 or 550, including recovery of up to three times the amount of any fraudulent insurance claims, and fines of between $5,000 and $10,000 for each such claim. Cal. Ins. Code §1871.7(b).

164.    Subsection (e) of Cal. Ins. Code §1871.7, the *qui tam* provision of the Act, was patterned after the federal False Claims Act, 31 U.S.C. §§3729 *et seq.*, and the California False Claims Act, Cal. Gov't Code §§12650 *et seq.*

165.    Subsection (a) of Cal. Ins. Code §1871.7 provides for civil recoveries against persons who "knowingly employ runners, cappers, steerers, or other persons . . . to procure

clients or patients to perform or obtain services or benefits under a contract of insurance or that

will be the basis for a claim against an insured individual or his or her insurer."

166.     Subsection (b) of Cal. Ins. Code § 1871.7 provides a range of penalties for

violations of Penal Code sections 549 or 550.  Section 549 of the California Penal Code provides

criminal penalties for anyone who: solicits, accepts, or refers any business to or from any

individual or entity with the knowledge that, or with reckless disregard for whether, the

individual or entity . . . intends to violate Section 550.

167.     Section 550 of the Penal Code prohibits the following activities, among others:

(a) It is unlawful to do any of the following, or to aid, abet, solicit, or conspire
with any person to do any of the following:

\* \* \* \* \* \*

(5) Knowingly prepare, make, or subscribe any writing, with the intent to
present or use it, or to allow it to be presented, in support of any false or
fraudulent claim.

(6) Knowingly make or cause to be made any false or fraudulent claim for
payment of a health care benefit.

\* \* \* \* \* \*

(b) It is unlawful to do, or to knowingly assist or conspire with any person to
do, any of the following:

(1) Present or cause to be presented any written or oral statement as part of, or
in support of or opposition to, a claim for payment or other benefit pursuant to
an insurance policy, knowing that the statement contains any false or
misleading information concerning any material fact.

(2) Prepare or make any written or oral statement that is intended to be
presented to any insurer or any insurance claimant in connection with, or in
support of or opposition to, any claim or payment or other benefit pursuant to
an insurance policy, knowing that the statement contains any false or
misleading information concerning any material fact.

(3) Conceal, or knowingly fail to disclose the occurrence of, an event that
affects any person's initial or continued right or entitlement to any insurance
benefit or payment, or the amount of any benefit or payment to which the
person is entitled.

Cal. Penal Code § 550.

168.     By virtue of the acts described in this Complaint, Defendant violated Cal. Ins. Code § 1871.7(a) by knowingly employing "other persons" to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that were the basis for claims against private insurers in the State of California

169.     By virtue of the acts described in this Complaint, Defendant violated California Penal Code § 549 by soliciting, accepting, or referring business to or from individuals and entities with the knowledge that, or with reckless disregard for whether, the individuals or entities intended to violate California Penal Code §550.

170.     By virtue of the acts described in this Complaint, Defendant knowingly presented or caused to be presented, false or fraudulent claims for healthcare benefits, in violation of Penal Code § 550(a).

171.     By virtue of the acts described in this Complaint, Defendant also concealed and/or failed to disclose information that would have affected the rights of patients and/or providers to receive reimbursement for sleep tests, in violation of Penal Code § 550(b).

172.     By virtue of these violations of California Penal Code §§ 549 and 550, Defendant violated California Insurance Code § 1871.7(b).

173.     Each prescription that was written as a result of Defendant's illegal kickbacks, illegal marketing practices, and/or illegal inducements represents a false or fraudulent record or statement. And, each claim for reimbursement for such prescriptions submitted to a health insurer represents a false or fraudulent claim for payment

174.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct. The false or fraudulent claims were presented for payment by

35

hundreds, if not thousands, of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

175.    Private insurers, unaware of Defendant's fraudulent acts and the falsity of the records, statements and claims made or caused to be made by Defendant, paid and continue to pay the claims that would not be paid but for Defendant's unlawful conduct.

176.    As a result of Defendant's commission of the insurance fraud described herein, the State of California and its citizens have been damaged in an amount in excess of millions of dollars, exclusive of interest.

177.    The California State Government is entitled to receive three times the amount of each claim for compensation submitted by Defendant in violation of Cal. Ins. Code §1871.7 Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

### COUNT VI
### Colorado False Claims Act, N.Y. St. Finance Law §187 et seq.

178.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

179.    This is a claim for treble damages and civil penalties under the New York False Claims Act, N.Y. St. Finance Law §187 *et seq.*

180.    By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

181.    The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal inducements and/or business practices.

182.     By reason of the Defendant's unlawful acts, the State of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## COUNT VII
## Connecticut False Claims Act, Conn. Code § 17b-301b *et seq.*

183.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

184.     This is a claim for treble damages and civil penalties under the Connecticut False Claims Act, Conn. Code § 17b-301b *et seq.*

185.     By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Connecticut Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

186.     The Connecticut Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

187.     By reason of these payments, the Connecticut Medicaid Program has been damages, and continues to be damaged in a substantial amount.

## COUNT VIII
## Delaware False Claims Act, Del. Code Ann. tit. 6, § 1201 *et seq.*

188.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

189.     This is a claim for treble damages and civil penalties under the Delaware False Claims Act, Del Code Ann. tit. 6, § 1201 *et seq.*

190. By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Delaware Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

191. The Delaware Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

192. By reason of these payments, the Delaware Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT IX
### Florida False Claims Act, Fla. Stat. Ann. 5 68.081 *et seq.*

193. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

194. This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq.*

195. By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Florida Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

196. The Florida Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

197. By reason of these payments, the Florida Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT X
### Georgia False Claims Act, Ga. Code Ann. § 49-4-168 *et seq.*

198.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

199.   This is a claim for treble damages and civil penalties under the Georgia False Claims Act, Ga. Code Ann. § 49-4-168 *et seq.*

200.   By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Georgia Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

201.   The Georgia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

202.   By reason of these payments, the Georgia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XI
### Hawaii False Claims Act, Haw. Rev. Stat. § 661-22 *et seq.*

203.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

204.   This is a claim for treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-22 *et seq.*

205.   By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Hawaii Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

206.    The Hawaii Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

207.    By reason of these payments, the Hawaii Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XII
### Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. 17511 *et seq.*

208.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

209.    This is a claim for treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. 17511 *et seq.*

210.    By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Illinois Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used a false record or statement.

211.    The Illinois Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

212.    By reason of these payments, the Illinois Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XIII
### Illinois Insurance Claims Frauds Prevention Act,
### 740 Ill. Comp. Stat. §92

213.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

213.    This is a claim for treble damages and penalties under the Illinois Insurance Claims Fraud Prevention Act, 740 Ill. Comp. Stat. §92/1 *et seq.* ("Illinois Insurance Fraud Act").

214.    Subsection 5(a) of the Illinois Insurance Fraud Act provides for a civil cause of action for any person who commits the crime of insurance fraud or who knowingly offers or pays "any remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer." 740 Ill. Comp. Stat. §92/5(a).

215.    Pursuant to 720 Ill. Comp. Stat. §5/46-1 of the Illinois Criminal Code, a person commits the offense of insurance fraud when he or she:

> knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company . . . .

720 Ill. Comp. Stat. §5/46-1(a).

216.    Subsection 15(a) of the Illinois Insurance Fraud Act provides for a *qui tam* civil action in order to create incentives for private individuals to disclose and prosecute violations of the statute. Subsection 15(a) provides: "An interested person, including an insurer, may bring a civil action for a violation of this Act for the person and for the State of Illinois. The action shall be brought in the name of the State." 740 Ill. Comp. Stat. §92/15(a).

217.    By virtue of the acts described in this Complaint, Defendant committed the following acts, or aided and abetted the commission of the following acts, in violation of the Illinois Insurance Fraud Act:

> (a) Defendant knowingly offered or paid remuneration directly or indirectly, in cash or in kind, to induce other persons to procure clients or patients to obtain services or benefits under a contract of insurance or that would be the basis for a claim against an insurer, in violation of 740 Ill. Comp. Stat. §92/5(a); and

> (b) Defendant knowingly obtained, attempted to obtain, and caused to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim and by causing a false claim to be made on a policy of insurance issued by an insurance company, in violation of 740 Ill. Comp. Stat.§92/5(b) and 720 Ill. Comp. Stat. §5/46-1(a).

41

218.    Each prescription that was written as a result of Defendant's illegal kickbacks, illegal marketing practices, and/or illegal inducements represents a false or fraudulent record or statement. And, each claim for reimbursement for such prescriptions submitted to a health insurer represents a false claim for payment.

219.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct. The false or fraudulent claims were presented by thousands of separate entities across State of Illinois.  Relator has no control over or dealings with such entities and has no access to the records in her possession.

220.    Private insurers, unaware of the falsity of the records, statements and claims made or caused to be made by Defendant, paid and continue to pay the claims that would not be paid but for Defendant's unlawful conduct, and have been damaged thereby.

221.    The Illinois State Government is entitled to receive three times the amount of each claim for compensation submitted by Defendant in violation of 740 Ill. Comp. Stat. §92. Additionally, the Illinois State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**COUNT XIV**
**Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5**

222.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

223.    This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5.

224.    By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Indiana Medicaid

Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

225.    The Indiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

226.    By reason of these payments, the Indiana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XV
### Iowa False Claims Act, Iowa Code § 685.3(2)(a)

227.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

228.    This is a claim for treble damages and civil penalties under the Iowa False Claims Act, Iowa Code § 685.3(2)(a).

229.    By virtue of the illegal acts, including the payment of commissions and to its sales representatives and improper submission of bills to various Government Healthcare Programs for equipment, supplies and services, as described more fully above, Defendant knowingly presented or caused to be presented to the Iowa Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

230.    The State of Iowa, or its political subdivisions, unaware of the falsity or fraudulent nature of  the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid for claims that otherwise would not have been allowed.

231.    By reason of these payments, the Iowa Medicaid Program has been damaged, and continues to be damaged in a substantial amount

## COUNT XVI
### Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1 *et seq.*

232.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

233.    This is a claim for treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1 *et seq.*

234.    By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Louisiana Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

235.    The Louisiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

236.    By reason of these payments, the Louisiana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XVII
### Maryland False Claims Act, Md. Code Ann. §2-601 *et seq.*

237.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

238.    This is a claim for treble damages and civil penalties under the Maryland False Health Claims Act of 2010, Md. Code Ann. § 2-601 *et seq.*

239.    By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Maryland Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

44

240.    The Maryland Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

241.    By reason of these payments, the Maryland Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XVIII
### Massachusetts False Claims Act, Mass. Ann. Laws ch. 12,§ 5(A)-(O)

242.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

243.    This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act, Mass. Ann. Laws ch. 12,§ 5(A)-(O).

244.    By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Massachusetts Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

245.    The Massachusetts Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

246.    By reason of these payments, the Massachusetts Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XIX
### Michigan Medicaid False Claims Act,
### MCLA §§ 400.601

247.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

248.    This is a claim for treble damages and civil penalties under the Michigan Medicaid False Claims Act, MCLA, §§ 400.601.

249.   By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Michigan Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

250.   The Michigan Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

251.   By reason of these payments, the Michigan Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT XX**
**Minnesota False Claims Act**
**§ 15C.01 *et seq.***

252.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

253.   This is a claim for treble damages and civil penalties under the Minnesota False Claims Act, § 15C.01 *et seq.*

254.   By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Minnesota Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

255.   The Minnesota Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

256.   By reason of these payments, the Minnesota Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XXI
### Montana False Claims Act
### Mont. Code Ann. § 17-8-401

257.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

258.    This is a claim for treble damages and civil penalties under the Montana False Claims Act, Mont. Code Ann. § 17-8-401.

259.    By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Montana Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

260.    The Montana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

261.    By reason of these payments, the Montana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XXII
### Nevada False Claims Act
### Nev. Rev. Stat. § 357.010 *et seq.*

262.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

263.    This is a claim for treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq.*

264.    By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Nevada Medicaid

Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

265.    The Nevada Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

266.    By reason of these payments, the Nevada Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

### COUNT XXIII
### New Hampshire Medicaid Fraud and False Claims
### N.H. Rev. Stat. Ann. § 167:61-b.1 *et seq.*

267.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

268.    This is a claim for treble damages and civil penalties under the New Hampshire Medicaid Fraud and False Claims Law, N.H. Rev. Stat. Ann. § 167:61-b, *et seq.*

269.    By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the New Hampshire Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

270.    The New Hampshire Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

271.    By reason of these payments, the New Hampshire Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT XXIV**
**New Jersey False Claims Act**
**N.J. Stat. § 2A:32C-1 *et seq.***

272.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

273.     This is a claim for treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. §§ 2A:32C-1 *et seq.*

274.     By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the New Jersey Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

275.     The New Jersey Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

276.     By reason of these payments, the New Jersey Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT XXV**
**New Mexico Medicaid False Claims Act**
**N.M. Stat. Ann. 1978, § 27-14-1 *et seq.***

277.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

278.     This is a claim for treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. 1978, § 27-14-1 *et seq.*

279.     By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the New Mexico Medicaid

Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used a false record or statement.

280.    The New Mexico Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

281.    By reason of these payments, the New Mexico Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT XXVI**
**New York False Claims Act**
**N.Y. State Fin. Law § 187**

282.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

283.    This is a claim for treble damages and civil penalties under the New York False Claims Act, N.Y. State Fin. Law § 187.

284.    By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the New York Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used a false record or statement.

285.    The New York Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

286.    By reason of these payments, the New York Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XXVII
### North Carolina False Claims Act
### N.C.G.S §1-605 *et seq.*

287.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

288.    This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, N.C.G.S §§1-605 *et seq.*

289.    By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the North Carolina Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used a false record or statement.

290.    The North Carolina Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

291.    By reason of these payments, the North Carolina Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XXVIII
### Oklahoma Medicaid False Claims Act
### Okla. Stat. tit. 63 § 5053

292.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

293.    This is a claim for treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63 § 5053.

294.    By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Oklahoma Medicaid

Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used a false record or statement.

295.    The Oklahoma Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

296.    By reason of these payments, the Oklahoma Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT XXIX**
**Rhode Island False Claims Act**
**R.I. Gen Laws § 9-1.1-3 *et seq.***

297.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

298.    This is a claim for treble damages and civil penalties under the Rhode Island False Claims Act, R.I. Gen Laws § 9-1.1-3 *et seq.*

299.    By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Rhode Island Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used a false record or statement.

300.    The Rhode Island Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

301.    By reason of these payments, the Rhode Island Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XXX
### Tennessee Medicaid False Claims Act
**Tenn. Code Ann. § 71-5-181 *et seq*. and Tennessee False Claims Act and**
**Tenn. Code Ann. § 4-18-101 *et seq*.**

302.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

303.    This is a claim for treble damages and civil penalties under the Tennessee Medicaid False Claims Act, and the Tennessee False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*; Tenn. Code Ann. § 4-1 8-101 *et seq.*

304.    By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Tennessee Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

305.    The Tennessee Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

306.    By reason of these payments, the Tennessee Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XXXI
### Texas Medicaid Fraud Prevention Act
**Tex. Hum. Res. Code Ann. § 36.001 *et seq*.**

307.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

308.    This is a claim for treble damages and civil penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*

309.    By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Texas Medicaid Program

false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

310.    The Texas Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

311.    By reason of these payments, the Texas Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XXXII
### Vermont False Claims Act

312.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

313.    This is a claim for treble damages and civil penalties under the Vermont False Claims Act.

314.    By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Vermont Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

315.    The Vermont Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

316.    By reason of these payments, the Vermont Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XXXIII
### Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*

385.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

386.   This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-21 6.1 *et seq.*

387.   By virtue of the illegal acts, including the payment of commissions and to its sales representatives and improper submission of bills to various Government Healthcare Programs for equipment, supplies and services, as described more fully above, Defendant knowingly presented or caused to be presented to the Virginia Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

388.   The Virginia Medicaid Program, unaware of the falsity or fraudulent nature of the claims and/or statements made by Defendant, paid for claims that otherwise would not have been allowed.

389.   By reason of these payments, the Virginia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XXXIV
### Virginia Fraud Against Taxpayers Act
### Va. Code Ann. § 8.01-216.1 *et seq.*

317.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

318.   This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-21 6.1 *et seq.*

319.   By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Virginia Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

320.   The Virginia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

321.   By reason of these payments, the Virginia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XXXV
### Wisconsin False Claims for Medical Assistance Act
### Wis. Stat. § 20.931 *et seq.*

322.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

323.   This is a claim for treble damages and civil penalties under the Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §§ 20.931 *et seq.*

324.   By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the Wisconsin Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

325.   The Wisconsin Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

326.   By reason of these payments, the Wisconsin Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XXXVI
### Chicago False Claims Act
### § 1-22-010 *et seq.*

327.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

328.    This is a claim for treble damages and civil penalties under the Chicago False Claims Act, § 1-22-010 *et seq.*

329.    By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the City of Chicago Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

330.    The City of Chicago Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

331.    By reason of these payments, the City of Chicago Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

332.    Upon information and belief, Defendant is a "city contractor" as that phrase is defined in the Chicago Municipal Code, § 1-22-030.

## COUNT XXXVII
### New York City False Claims Act
### New York City Administrative Code §7-801-§7-810

333.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

334.    This is a claim for treble damages and penalties against the Defendant on behalf of the City of New York under the New York City False Claims Act, New York City Administrative Code §7-801-§7-810.

335.    By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the City of Chicago

Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

336.   By virtue of the above-described acts, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New York City Government to approve and pay such false and fraudulent claims.

337.   The New York City Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal inducements and/or business practices.

338.   By reason of Aqua's unlawful acts, the City of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

**COUNT XXXVIII**
**District of Columbia False Claims Act**
**D.C. Code § 2-308.14 *et seq.***

339.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

340.   This is a claim for treble damages and civil penalties under the District of Columbia False Claims Act, D.C. Code 5 2-308.14 *et seq.*

341.   By virtue of the kickback scheme and other illegal promotion activities described above, Defendant knowingly presented or caused to be presented to the District of Columbia Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

342.    The District of Columbia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

343.    By reason of these payments, the District of Columbia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**WHEREFORE**, Relator requests that judgment be entered against Defendant Aqua Pharmaceuticals, LLC, ordering that:

a.  Defendant ceases and desists from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.* and similar provisions of the state and municipal false claims acts identified above;

b.  Declaring the acts and practices of Defendant complained of herein to be in violation of the FCA and similar provisions of the state and municipal false claims acts identified above;

c.  Defendant pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 *et seq.*, plus three times the amount of damages the United States has sustained because of the Defendant' actions;

d.  Relator be awarded the maximum "Relator's share" allowed pursuant to 31 U.S.C. § 3730(d) and similar provisions of the state false claims acts;

e.  Relator be awarded all expenses and costs incurred in connection with this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and similar provisions of the state and municipal false claims acts identified above, as well as all prejudgment interest;

f.  Relator be provided with injunctive or equitable relief, as may be appropriate, to prevent further harm to himself/herself and to prevent the harm to others and the public that may be caused by Defendant' retaliation against whistleblowers;

g.  Relator be awarded all litigation costs, expert fees, and reasonable attorneys' fees incurred as provided pursuant to 31 U.S.C. § 3730(h) and similar provisions of the state and municipal false claims acts identified above;

h.  Disgorgement of all monies received by Defendant through the submission of false claims in or relating to patients in the State of California pursuant to Cal. Ins. Code § 1871.7 *et seq*;

i. Three times the amount of each false claim Defendant submitted and caused to be submitted under a contract of insurance in or relating to an insured in the State of California pursuant to Cal. Ins. Code § 1871.7(b);

j. A civil penalty of $5,000 to $10,000 for each false claim Defendant submitted or caused to be submitted under a contract of insurance in or relating to an insured in the State of California pursuant to Cal. Ins. Code § 1871.7(b);

k. Relator be awarded an amount not less than thirty percent (30%) of the proceeds of this action pursuant to Cal. Ins. Code § 1871.7(g);

l. Disgorgement of all monies received by Defendant through the submission of false claims pursuant to 740 ILCS § 92/5 *et seq*;

m. Three times the amount of each false claim Defendant submitted and caused to be submitted under a contract of insurance pursuant to 740 ILCS § 92/5(b);

n. A civil penalty of $5,000 to $10,000 for each false claim Defendant submitted or caused to be submitted under a contract of insurance pursuant to 740 ILCS § 92/5(b);

o. Relator be awarded an amount not less than thirty percent (30%) of the proceeds of this action pursuant to 740 ILCS § 92/25(a);

p. Defendant be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

q. Defendant disgorge all sums by which they have been enriched unjustly by their wrongful conduct; and

r. The United States, the Individual States, and Relator recover such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator demands a jury trial.

Respectfully submitted,

ROSS FELLER CASEY, LLP

Dated: September 11, 2015

Brian J. McCormick, Jr.
Robert Ross, Esquire
Joel J. Feller, Esquire
Matthew A. Casey, Esquire
One Liberty Place
1650 Market St., Suite 3450
Philadelphia, PA 19103
bmccormick@rossfellercasey.com
Tel.:  215-574-2000

/s/ Claudine Q. Homolash
Claudine Homolash, Esquire
CQH Firm
One Liberty Place
1650 Market Street, 36th Floor
Philadelphia, PA 19103
Tel: 267-207-2730

Attorneys for Plaintiff-Relator John Doe